DAVID IRA KNAPP, AN INFANT, BY WILBUR KNAPP, HIS NEXT FRIEND, PETITIONER-DEFENDANT, v. C. F. MUELLER & CO. ET AL., RESPONDENTS-PROSECUTORS.

Argued January 23, 1947—Decided February 18, 1947.

Before Justices Bodine, Perskie and Wachenfeld.

For the petitioner-defendant, *Greenstone & Greenstone* (*John A. Laird*).

For the respondents-prosecutors, *Kalisch & Kalisch* (*Isidor Kalisch*).

Bodine, J. This is a workmen's compensation case. The infant petitioner, a lad only a few months over sixteen years of age, went to work in the prosecutors' factory for a wage of 62½ cents an hour for 25 hours a week. His duty seems to have been to take pads off layers of macaroni in boxes and place them in another box. Another lad then placed the macaroni in trays in a machine called a separator.

The case was most carefully tried in the Bureau. The deputy commissioner went to the employers' factory with counsel and examined the machine where the boy was hurt. He describes it as follows: "It consists of an endless chain about forty feet long, about fifteen inches wide, mounted at

each end on two parallel cogwheels which revolve, causing the chain to move endlessly. At intervals along this chain are small wooden boards, or paddles, at intervals of twelve to fifteen inches. The petitioner indicated in the presence of both counsel that he was working at the end of the machine farther away from the window, where the actual operation of separation of spaghetti takes place, a distance of some twenty feet. The end at which the petitioner states he was working is only the conveyor part of this large machine called the separator. The paddles, traveling on the endless chain, as already indicated, come flush with the platform or table part of the machine at a time interval of five seconds. This was actually clocked in our presence by a representative of the respondent. The distance between the end of the table where the petitioner states he was working and the point at which the paddle comes flush with said table top is about fifteen inches. At the bottom of each paddle there is a thin metal strip firmly fastened to the bottom of each paddle. The distance between the end of the table where the petitioner states he was working and the nearest safety switch on the side of the machine (there being several) is 55 inches, by actual measurement made in the presence of all. The distance between the end of the table and the point at which the paddle approaches the top of the table to within half an inch of said top of table is approximately 13 inches. The distance between the edge of the table and the front edge of the paddle is 11 inches. The paddles traveling on their return trip, that is, traveling on the top of the machine and the endless chain, are unscreened and unprotected. The cogwheel, however, carrying the endless chain—there being two such cogwheels on either end of the machine—is encased in a screen. The entire machine is power-driven by electricity."

The infant, at the time of injury, was resting for a few seconds at the short side of the machine. He described the occurrence which led to his injury as follows: "My two fingers on the right hand were caught underneath the paddle of the machine at the end there and then drawed me in, pulled my arm and my head right in. Q. What part of the machine caught your two fingers? A. At the shortest part

of the machine underneath the paddle. *Q.* How far under did your hand go? *A.* I don't know. I was unconscious then. *Q.* And you say your head was caught also? *A.* Yes. *Q.* Do you remember what happened to you after that? *A.* I came to on the floor there. *Q.* Were you unconscious? *A.* Semi-unconscious. *Q.* Did you lose consciousness? *A.* Yes. I come out of it once in a while. *Q.* And when you came to someone was there from the company? *A.* I was on the floor there when I came to first. When I came to, they were loading me into the ambulance. I came to again in the hospital. *Q.* Do you know how long that machine was in operation when you were caught in it? *A.* I don't. *Q.* Well, were these paddles moving? *A.* When I was caught they were. *Q.* Did these paddles strike you? *A.* Yes. *Q.* Will you tell what part of your body the paddles struck? *A.* Struck two fingers, then the arm, then the head. * * * *Q.* Do you remember before you were unconscious whether the machine was moving while you were caught in there? *A.* It was. *Q.* The paddles were revolving around. until the time you lost consciousness? *A.* That's right. *Q.* And these paddles, was there more than one paddle that struck you on the head before you lost consciousness? *A.* I don't believe there was. *Q.* You don't know. *A.* I don't know * * *. *Q.* Did you have any way to stop the machine from where you were caught? *A.* It is out of the reach from my reach. * * * *Q.* What were you doing when you got your hand caught? *A.* I was taking pads off the machine. Then I would have to wait for the other boy to empty the trays. *Q.* Well, where were you standing when your hand was caught? Were you facing the machine? *A.* Yes. *Q.* What were you doing at the time, just at the moment that your hand was caught? *A.* I believe I was resting, waiting for the other boy to finish off the trays. * * * *Q.* You say first the hand or the fingers were caught? *A.* Two fingers. * * * *Q.* How did they happen to get caught? *A.* I don't know. It might have slipped in. That's the only reason I can give for that. *Q.* Now, was this at the short end of the machine? *A.* Yes."

So the proofs stood when an investigator for the insurance carrier took the stand.

It is inferable from other testimony that the hand was drawn into the machine with the palm up. He was found bleeding with his legs under the separator and his arm caught under the paddles. His injuries were substantial.

The youth having been asked about a signed statement, which he had given to the investigator shortly after his release from the hospital, stated it was true. In this statement, he said: "When I reached over to hold the wooden paddle, that was not part of my job. My job did not require me to work at the conveyor belt or table. My job was only to remove the pads from the macaroni. When I started to work removing the pads, I was told by my foreman Eddie Elsasser that I was only to work removing pads, and not to work at the conveyor or belt. Several times before I had taken hold of the paddles to slow the motion of the conveyor. It was not part of my job, but I with other employees did this to pass the time."

The Commissioner justified his finding of no liability on this contradiction of the youth's testimony. In the Court of Common Pleas the opposite result followed. It is perfectly obvious that if the boy was trying to slow the paddles he would grab them at the top rather than at the bottom. To us it seems that the probable occurrence was that the boy slipped while he was resting at the end of the machine and the injuries were then suffered. It seems to us that the probabilities of the occurrence more strongly preponderate in favor of this view so as to compel us so to factually find.

Shortly after the boy left the hospital he went to the factory to get his pay. He was asked to wait in the cafeteria and the investigator happened in. He was skilled in procuring statements. The boy was, as appears from the record, not too intelligent for his years. When he made the statement, he was still in a highly nervous condition; he wanted his pay. The account of the occurrence is couched in the language of an investigator and not in that of an untutored youth. We place much greater credence in his testimony in the Bureau than in the carrier's self-serving doubtfully procured statement.

The correct result was reached in the Common Pleas. Further, we find in the record no explanation for the lack of a guard on the machine so obviously needed and so easy to install.

The judgment of the Court of Common Pleas reversing the Bureau will be affirmed, with costs.